Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel: (213) 785-2610; Fax: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff Sharon Burgs*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARON BURGS, derivatively on behalf of GOODRX HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> DOUGLAS HIRSCH, TREVOR BEZDEK, KARSTEN VOERMANN, CHRISTOPHER ADAMS, JULIE BRADLEY, DIPANJAN DEB, AGNES REY-GIRAUD, ADAM KAROL, JACQUELINE KOSECOFF, STEPHEN LESIEUR, and GREGORY MONDRE, <br><br> Defendants, <br><br> and <br><br> GOODRX HOLDINGS, INC., <br><br> Nominal Defendant. | Case No. <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> DEMAND FOR JURY TRIAL |

1

## INTRODUCTION

Plaintiff Sharon Burgs ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant GoodRx Holdings, Inc. ("GoodRx" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants Douglas Hirsch ("Hirsch"), Trevor Bezdek ("Bezdek"), Karsten Voermann ("Voermann"), Christopher Adams ("Adams"), Julie Bradley ("Bradley"), Dipanjan Deb ("Deb"), Agnes Rey-Giraud ("Rey-Giraud"), Adam Karol ("Karol"), Jacqueline Kosecoff ("Kosecoff"), Stephen Lesieur ("Lesieur"), and Gregory Mondre ("Mondre") (collectively, the "Individual Defendants," and together with GoodRx, "Defendants") for breaches of their fiduciary duties and violation of the federal securities laws.

Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding GoodRx, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a shareholder derivative action brought against certain GoodRx officers and members of GoodRx's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants between September 23, 2020 and November 8, 2022, inclusive (the "Relevant Period").

2.      GoodRx offers a price comparison platform that provides consumers with access to lower priced prescription medications through discount codes and coupons. GoodRx's stated goal is to provide generic and brand medications at affordable and accessible prices for both consumers and healthcare providers.

3.      The Company generates most of its revenue from contracts with pharmacy benefit managers ("PBMs") who agree to pay the Company a commission on prescription drug purchases made by consumers who use the Company's discount codes and coupons at participating pharmacies. The Company also generates a portion of its revenue from subscription plans like the "Kroger Rx Savings Club," which provides "access [to] lower prescription prices at" pharmacies operated by The Kroger Co. ("Kroger").

4.      The Company's consumer pricing platform allows both insured and uninsured consumers to search for a broad range of offerings for prescription medicines based on individual preferences. GoodRx has also recently announced that it intends to expand the number of pharma manufacturers the Company works with, enhance existing offerings, and introduce new integrated technology solutions that will facilitate interactions between manufacturers and GoodRx's consumer base.

5.      Pursuant to GoodRx's September 23, 2020 initial public offering ("IPO"), and throughout the Relevant Period, the Individual Defendants touted the strength of the Company's relationships with pharmacies as foundational to their business strategy. For example, the Individual Defendants emphasized the Kroger Rx Savings Club, stating that "[Kroger offers] access [to] lower prescription prices at Kroger pharmacies, including over 100 common generic medications for free,

$3,00, or $6.00 price points, and savings on more than 1,0000 other generic medications."

6.      However, Defendants never informed shareholders of the material risk that Kroger, which accounted for nearly 25% of the Company's prescription transactions revenue, could unilaterally refuse to accept GoodRx's discounts.

7.      The truth began to emerge on May 9, 2022, when the Company revealed that "a grocery chain had taken actions that impacted acceptance of discounts from most PBM for a subset of drugs and that this impacted the acceptance of many PBM discounts for certain drugs at this grocer's stores." However, the Individual Defendants did not identify Kroger by name. Instead, the Individual Defendants referred to Kroger only as "a grocery chain." The Individual Defendants also revealed that these actions "could have an estimated revenue impact of roughly $30 million" for the fourth quarter of 2022.

8.      During an investor earnings call that same day, Defendant Bezdek admitted that "the grocery chain" accounted for twenty-five percent of GoodRx's prescription transaction revenue. Again, the Individual Defendants failed to identify Kroger by name. Nevertheless, Kroger's identity was quickly determined through media outlets and industry analysts.

9.      On this news, GoodRx's stock price fell by approximately 25% per share, from the May 9, 2022 market close price of $10.75 per share to the May 10, 2022 market close price of $7.97 per share.

10.     Then, on November 8, 2022, the Company issued a press release (the "November 2022 Press Release") titled, "GoodRx Reports Third Quarter 2022 Results," which revealed that the Company estimated that the "impact of the grocer issue on third quarter [prescription transactions revenue] was approximately $40

million" and forecasted an expected $45 to $50 million impact on GoodRx's prescription transactions revenue for the fourth quarter of 2022.

11.    On this news, GoodRx's stock price fell approximately 22% per share, from the November 8, 2022 market close price of $5.24 per share to the November 9, 2022 market close price of $4.06 per share.

12.    In light of the Individual Defendants' misconduct—which has subjected the Company, both former Chief Executive Officers ("CEO"), and its Chief Financial Officers ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefited from the wrongdoing alleged herein—the Company will have to expend many significant sums of money.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), Section 20(a) of the Exchange Act (15 U.S. 78t(a) and 78t-1), and Section 21D of the Exchange Act (15 U.S.C. §78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 USC. §1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District because GoodRx's principal executive offices are located within this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## **PARTIES**

17.     Plaintiff is a current shareholder of GoodRx and has continuously held GoodRx common stock at all relevant times.

18.     Nominal Defendant GoodRx is a Delaware corporation with its headquarters at 2701 Olympic Boulevard, Santa Monica, California, 90404. GoodRx's Class A common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "GDRX."

19.     Defendant Hirsch co-founded GoodRx in September 2011 with Defendant Bezdek and has served as the Company's Chief Mission Officer since April 2023. Defendant Hirsch has also served as a Company director since September 2011. Previously, he served as Co-CEO from the Company's founding until April 2023. For the fiscal year ended December 31, 2023, (the "2023 Fiscal Year"), Defendant Hirsch received $784,856 in total compensation from the Company. For the fiscal year ended December 31, 2022, (the "2022 Fiscal Year"), Defendant Hirsch received $507,290 in compensation from the Company. For the year ended December 31, 2021, (the "2021 Fiscal Year"), Defendant Hirsch received $879,104 in total compensation from the Company. For the fiscal year

ended December 1, 2020, (the "2020 Fiscal Year"), Defendant Hirsch received $267,650,186 from the Company, including $266,662,480 in stock awards.

20.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hirsch made the following sales of Company Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|------|------------------|------------------|----------|
| March 22, 2021 | 131,066 | $36.63 | $4,800,410 |
| June 23, 2021 | 94,615 | $37.90 | $3,585,908 |
| June 24, 2021 | 34,760 | $38.49 | $1,337,815 |
| September 24, 2021 | 123,422 | $45.24 | $5,583,611 |
| September 27, 2021 | 5,952 | $43.26 | $257,483 |
| December 15, 2021 | 129,375 | $37.52 | $4,854,150 |

21.    In total, before the fraud was exposed, Defendant Hirsch sold 519,190 shares of Company Class A common stock on inside information, for which he received approximately $20,419,378 in proceeds. Defendant Hirsch's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

22.    Defendant Bezdek co-founded GoodRx in September 2011 with Defendant Hirsch and has served as the Company's Chairman of the Board since April 2023 and as a Company director since 2011. Defendant Bezdek was previously the Company's Co-CEO from the Company's founding until April 2023. For the 2023 Fiscal Year, Defendant Bezdek received $811,528 in total compensation from the Company. For the 2022 Fiscal Year, Defendant Bezdek received

$537,005 in total compensation from the Company. For the 2021 Fiscal Year, Defendant Bezdek received $891,681 in total compensation from the Company. For the 2020 Fiscal Year, Defendant Bezdek received $267,652,442 in total compensation from the Company, including $266,662,480 in stock awards.

23.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bezdek made the following sales of Company Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
| --- | --- | --- | --- |
| March 22, 2021 | 131,066 | $36.77 | $4,819,296 |
| June 23, 2021 | 94,855 | $37.90 | $3,595,004 |
| June 24, 2021 | 34,520 | $38.48 | $1,328,329 |
| September 24, 2021 | 124,370 | $45.19 | $5,620,280 |
| September 27, 2021 | 5,004 | $43.27 | $216,523 |
| December 22, 2021 | 64,271 | $35.19 | $2,261,696 |
| December 23, 2021 | 65,104 | $33.98 | $2,212,233 |

24.     Thus, in total, before the fraud was exposed, Defendant Bezdek sold 519,190 shares of Company Class A common stock on inside information, for which he received approximately $20,053,364 in proceeds. Defendant Bezdek's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

25.     Defendant Voermann has served as the Company's CFO since March 2020. For the 2023 Fiscal Year, Defendant Voermann received $902,242 in total compensation from the Company. For the 2022 Fiscal Year, Defendant Voermann

received $5,235,060 in total compensation from the Company. For the 2021 Fiscal Year, Defendant Voermann received $520,970 in total compensation from the Company.

26.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Voermann made the following sales of Company Class A common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 29, 2021 | 150,000 | $37.76 | $5,664,000 |
| April 28, 2021 | 12,500 | $40.64 | $508,000 |
| May 28, 2021 | 12,500 | $38.39 | $479,875 |
| July 28, 2021 | 12,500 | $32.69 | $408,625 |
| August 30, 2021 | 12,500 | $37.35 | $466,875 |
| September 28, 2021 | 7,500 | $40.87 | $306,525 |
| November 1, 2021 | 12,500 | $22.02 | $275,250 |
| December 1, 2021 | 12,500 | $39.29 | $491,125.00 |
| December 28, 2021 | 12,500 | $33.05 | $413,125 |

27.     Thus, in total, before the fraud was exposed, Defendant Voermann sold 245,000 shares of Company Class A common stock on inside information, for which he received approximately $9,013,400 in proceeds. Defendant Voermann's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

28.    Defendant Adams has served as a Company director since October 2015. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

29.    Defendant Bradley has served as a Company director since August 2020. She also serves as the Chair of the Audit Committee. For the 2023 Fiscal Year, Defendant Bradley received $272,525 in total compensation from the Company. For the 2022 Fiscal Year, Defendant Bradley received $210,798 in total compensation from the Company. For the 2021 Fiscal Year, Defendant Bradley received $277,536 in total compensation from the Company. For the 2020 Fiscal Year, Defendant Bradley received $784,207 in total compensation from the Company.

30.    Defendant Deb has served as a Company director since August 2015 and as a member of the Board since October 2015.

31.    Defendant Rey-Giraud has served as a Company director since June 2016. She also serves as the Chair of the Compliance Committee and as a member of the Audit Committee. For the 2023 Fiscal Year, Defendant Rey-Giraud received $269,525 in total compensation from the Company. For the 2022 Fiscal Year, Defendant Rey-Giraud received $207,798 in total compensation from the Company. For the 2021 Fiscal Year, Defendant Rey-Giraud received $276,199 in total compensation from the Company. For the 2020 Fiscal Year, Defendant Rey-Giraud received $118,601 in total compensation from the Company.

32.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Rey-Giraud made the following sales of Company Class A common stock:

10

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| September 16, 2021 | 5,909 | $45.01 | $265,964 |
| September 14, 2021 | 14,454 | $45.00 | $650,430 |
| September 15, 2021 | 4,637 | $45.03 | $208,804 |
| September 7, 2021 | 54,370 | $41.56 | $2,259,617 |
| April 1, 2021 | 25,000 | $40.01 | $1,000,250 |
| March 22, 2021 | 25,000 | $36.38 | $909,500 |

33.    Thus, in total, before the fraud was exposed, Defendant Rey-Giraud sold 129,370 shares of Company Class A common stock on inside information, for which he received approximately $5,294,565 in proceeds. Defendant Rey-Giraud's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

34.    Defendant Karol served as a Company director from 2018 until March 2024. He also served as a member of the Compliance Committee.

35.    Defendant Kosecoff served as a Company director from 2016 until July 2023. For the 2023 Fiscal Year until his resignation, Defendant Kosecoff received $65,439 in total compensation from the Company. For the 2022 Fiscal Year, Defendant Kosecoff received $151,798 in total compensation from the Company. For the 2021 Fiscal Year, Defendant Kosecoff received $267,003 in total compensation from the Company. For the 2020 Fiscal Year, Defendant Kosecoff received $121,842 in total compensation from the Company.

36.    Defendant LeSieur served as a Company director from 2015 until March 2024. He also served on the Compliance Committee and the Nominating and Corporate Governance Committee.

37.    Defendant Mondre has served as a Company director since October 2018. He is currently the Chair of the Compensation Committee and a former member of the Nominating and Corporate Governance Committee. He resigned from the Nominating and Corporate Governance Committee in July 2023.

38.    Non-Party Kelly Kennedy ("Kennedy") has served as a Company director since December 2023. She has also served as Chair of the Audit Committee since December 2023. Pursuant to the Company's Non-Employee Director Compensation Program, an automatic initial award of restricted stock units ("RSUs") with an aggregate target value of $420,000 was granted to Kennedy upon her election to the Board. Kennedy is named herein solely for the purposes of demand futility.

39.    Non-Party Ian T. Clark ("Clark") has served as a Company director since July 2024. Pursuant to the Company's Non-Employee Director Compensation Program, Clark was granted an automatic initial award of RSUs with a value of $420,000, as well as a pro-rated Annual Award of RSUs with a value of $209,836, upon his election to the Board. Clark is named herein solely for the purposes of demand futility.

40.    Non-Party Simon Patterson ("Patterson") has served as a Company director since May 2024. Patterson is named herein solely for the purposes of demand futility.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

41.    By reason of their positions as officers, directors, and/or fiduciaries of GoodRx and because of their ability to control the business and corporate affairs of GoodRx, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders.

42.    Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with the Company, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and

13

improper representations of the Company.

44.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and

rules and regulations; and

(f)   ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

45.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

46.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information

concerning the Company's operations, financial condition and dependence, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

48. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of GoodRx was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

50. At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of GoodRx and was at all times acting within the course and scope of such agency.

## THE CODE OF BUSINESS CONDUCT AND ETHICS

51.     GoodRx's Code of Business Conduct and Ethics (the "Code of Conduct" or the "Code") applies to all GoodRx employees, including "directors, officers, and employees."

52.     The "Introduction and Overview" to the Code of Conduct states the following, in relevant part:

> This Code of Business Conduct and Ethics ("the Code") contains general guidelines for conducting the business of GoodRx Holdings, Inc (the *"Company"* or *"we"*) consistent with the highest standards of business ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, the Company adheres to these higher standards.

53.     Under the heading "Compliance with Laws and Regulations," the Code of Conduct states:

> Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are

expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Company's General Counsel.

54.    Under the heading "Compliance with Insider Trading Laws," within the "Compliance with Laws and Regulations" section, the Code of Conduct states in relevant part that, "the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company."

55.    In the section titled "Public Communications Generally," the Code of Conduct states:

The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysists, etc.), consistent without obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Statement – Guidelines for Corporate Disclosure to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

56.     In the section titled "Company Records," the Code of Conduct makes it clear that "[a]ccurate and reliable records are crucial to our business." The Code of Conduct further goes on to state, "[a]ll Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control."

57.     In the section titled "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct provides:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability. The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

58.     While the Code of Conduct does allow directors and executives to waive the provisions of the Code of Conduct, they may only do so with the permission of either the Board or the Audit committee. The Code of Conduct

emphasizes that any waiver "will be disclosed to the public as required by law or the rules of The Nasdaq Stock Market LLC, when applicable."

### CORPORATE GOVERNANCE GUILDELINES

59.     The Company also maintains Corporate Governance Guidelines (the "Governance Guidelines.") Under the section titled "Director Responsibilities," the Governance Guidelines state:

> The business and affairs of the Company will be managed by or under the direction of the Board, including through one or more of its committees as set forth in the bylaws and committee charters. Each director is expected to spend the time and effort necessary to properly discharge his or her responsibilities. These include:
>
> - exercising their business judgment in good faith;
>
> - acting in what they reasonable believe to be the best interest of all stockholders;
>
> - becoming and remaining well-informed about the Company's business and operations and general business and economic trends affecting the Company; and
>
> - ensuring that the business of the Company is conducted so as to further the long-term interests of its stockholders.

### AUDIT COMMITTEE CHARTER

60.     GoodRx's Audit Committee Charter (the "Audit Committee Charter") states that the purpose of the Audit Committee is:

> to (i) oversee the accounting and financial reporting processes of

GoodRx Holdings, Inc. (the "*Company*") and the audits of the financial statements of the Company, (ii) assist the Board in overseeing the overall risk management of the Company and oversee certain material risk exposures of the Company and (iii) oversee the Company's internal audit function.

The Committee's responsibilities are limited to oversight. The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Corporations' financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

61.     The Audit Committee Charter states that, regarding annual financial statements and financial reporting, the duties and responsibilities of the Audit Committee are as follows:

- *Audit Problems.* The Committee must discuss with the independent auditor any audit problems, financial reporting issues or difficulties in connection with the preparation of the Company's financial statements and management's response.
- *Form 10-K Review.* The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under

"Management's Discussion and Analysis of Financial Condition and Results of Operations."

- *Audit Committee Report.* The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

62.   The Audit Committee Charter states that, regarding quarterly financial statements and financial reporting, the duties and responsibilities of the Audit Committee are as follows:

- *Form 10-Q Review.* The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

63.   The Audit Committee Charter states under the heading "Risk Assessment and Risk Management," that" "[t]he Committee must review and discuss the Company's policies and procedures with respect to risk assessment and risk management and shall oversee certain of the Company's major risk exposures as set forth below." The duties and responsibilities of the Audit Committee are as follows:

- **<u>Financial and Enterprise Risk.</u>** The Committee will review and assess, at least annually, the Company's major financial and

enterprise risk exposures, including fraud risks, and the steps management has taken to monitor or mitigate such exposures.

- **Other Risk Oversight.** The Committee will review and assess the Company's risk exposures in other areas, as the Committee deems necessary or appropriate from time to time; however, the Committee shall not be responsible for the detailed oversight of any risk exposures that have been delegated by the Board to another committee of the Board.

64.     The Audit Committee Charter also requires the Audit Committee to "periodically consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics … and the procedures in place to enforce the Code."

65.     In addition, GoodRx's Audit Committee Charter requires that the Audit Committee "must periodically perform an evaluation of the performance of the Committee."

## SUBSTANTIVE ALLEGATIONS

66.     On September 22, 2020, GoodRx filed a prospectus (the "Prospectus") on Form 424b4 with the SEC on September 22, 2020. The Prospectus characterized GoodRx's relationship with Kroger as a significant strength, stating that "We partner with Kroger, the fourth largest retail pharmacy in the United States, to offer a tailored subscription product to Kroger consumers… We manage key aspects of the program, including subscriber registration, consumer billing, transaction processing and marketing."

67.    In a section titled, "How We Make Money," the Prospectus stated, in relevant part:

> When a consumer uses a GoodRx code to fill a prescription … we receive fees from our partners, primarily PBMs… Revenue from prescription transactions fees made up approximately 94% of our revenue in 2019 and 91% of revenue in the first half of 2020. We have seen strong repeat activity on our platform due to the typical refill cycle **and long-term nature of most prescriptions**.

> **Subscription Offerings**: Our subscription offerings are a natural extension of our successful prescription offering … We launched … Kroger Savings, in 2018. We receive subscriptions fees from subscribers for these offerings, and for Kroger Savings we share a portion of these fees with Kroger. We recognize the subscription fees, net of Kroger's share, as revenue over the subscription period. We have significantly increased the number of subscribers who use our subscription offerings. The number of subscribers as of June 30, 2020 was 15 times higher than as of December 31, 2018. Based on our data for the cohort of consumers who started using our subscription offerings between July 2018 and June 2019, we estimate that consumers of our subscription offerings have a first year contribution of approximately two times that of consumers of our prescription offering, which we expect will result in a substantially higher lifetime value for these consumers. First year contribution represents the cumulative revenue generated by consumers in the first year after

they became consumers of our subscription offerings, less our estimated cost of revenue attributable to such revenue.

68.    GoodRx also highlighted the Kroger Rx Savings Club—which provides "access [to] lower prescription prices at Kroger pharmacies, including over 100 common generic medications for free, $3.00, or $6.00 price points, and savings on more than 1,000 other generic medications." The Company failed to disclose, however, its significant dependence on a single pharmacy chain—Kroger—and that, notwithstanding GoodRx's contractual agreement with Kroger forming the Kroger Rx Savings Club, Kroger could unilaterally refuse to accept GoodRx's discounts.

69.    Indeed, in addressing risk factors specific to the Kroger Rx Savings Club, the IPO prospectus stated, "[t]hese risks and challenges include our ability to… increase and retain our consumers that subscribe to our subscription offerings, such as Gold and Kroger Savings." GoodRx once again failed to disclose Kroger's ability to unilaterally refuse acceptance of GoodRx's codes and coupons and failed to disclose the near 25% impact Kroger had on GoodRx's prescription transaction revenue.

70.    In a series of ensuing industry conferences, certain Individual Defendants touted the Company's strong, long-lasting relationships with pharmacies, but failed to disclose pharmacies' ability to unilaterally stop accepting GoodRx discounts. For example, at the RBC Global Technology, Internet, Media and Telecommunications Conference (Virtual) on November 18, 2020, when discussing the Company's relationships with pharmacies, Defendant Hirsch stated that GoodRx had close business relationships with pharmacies "to the point where [the Company was] talking almost daily with [them]," and Defendant Voermann

likewise explained that "pharmacies are our friends. . . . and we see that continuing far into the future."

71.    Defendants also assured investors that the Company's relationships with pharmacies were strong because pharmacies could not set or advertise lower prices, while GoodRx, acting with PBMs, could. For example, at the Credit Suisse Technology Conference (Virtual) on December 3, 2020, Defendant Hirsch explained that, "I know this is really hard for people to get through their head, but pharmacies cannot set their own prices without getting in a lot of trouble. . . . they cannot just wake up tomorrow and go, we're going to make every drug X dollars."

72.    As Defendant Hirsch reiterated a few days later at the UBS Global TMT Conference (Virtual) on December 8, 2020, pharmacies were dependent on GoodRx to set rates. To this end, Defendant Hirsch emphasized that GoodRx "help[s] PBMs . . . and pharmacies make money" because "[t]hey use us as a way to drive prices because they can't do it themselves."

73.    On March 12, 2021, the Company filed with the SEC its annual report on Form 10-K for the fourth quarter and full year 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Hirsch, Bezdek, Voermann, Adams, Bradley, Deb, Karol, Kosecoff, LeSiuer, Mondre, and Rey-Giraud. The 2020 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Hirsch, Bezdek, and Voermann, which attested to the accuracy of the filing and the Company's disclosure controls.

74.    In connection with the 2020 10-K, GoodRx again touted the Kroger Rx Savings Club, explaining that its "subscription offerings are a natural extension of our successful prescription offering" and "leverage[s] our relationships across the healthcare ecosystem and our product expertise to provide subscribers with even

greater savings and convenience at select pharmacies." To this end, GoodRx emphasized that it "partner[s] with Kroger, the fourth largest retail pharmacy in the United States, to offer a tailored subscription product to Kroger consumers" and represented that the "subscription offerings are designed to be easy to use and provide subscribers with added benefits and features."

75.    Similarly, in connection with its annual report for the fourth quarter and full year 2021 (the "2021 10-K") filed with the SEC on February 28, 2022, GoodRx again highlighted the Kroger Rx Savings Club, in which the Company "partner[s] with Kroger, one of the largest retail pharmacies in the United States, to offer a tailored subscription product to Kroger consumers." The 2021 10-K was signed by Defendants Hirsch, Bezdek, Voermann, Adams, Bradley, Deb, Karol, Kosecoff, LeSieur, Mondre, and Rey-Giraud. The 2021 10-K also contained SOX certifications signed by Defendants Hirsch, Bezdek, and Voermann.

76.    During GoodRx's investor earnings call held that same day to discuss the Company's fourth quarter and full-year 2021 financial results, Defendant Bezdek emphasized that the Company's "relationships with PBMs remain great. . . . [and GoodRx's] relationships with [pharmacies] are very good." Defendant Bezdek further noted that the Company had not "seen any significant changes or developments" with these partners that would have a material impact on financial results.

77.    Less than a month later at the Deutsche Bank Media, Internet and Telecom Conference on March 15, 2022, Defendant Voermann, when asked about possible pressures from the Company's partners (including pharmacies) that would disrupt the Company's revenue model, deflected the question and instead reiterated that GoodRx "ha[s] deep relationships with all of the big pharmacies out there. . . .

[and] we feel like our relationship with all the big pharmacies, which is where all the volume flows through are really strong."

78.    The above-referenced statements were materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (i) while Kroger accounted for less than 5% of the pharmacies accepting GoodRx discounts, Kroger was responsible for nearly 25% of GoodRx's total prescription transactions revenue (the Company's primary revenue stream); and (ii) Kroger could unilaterally cease accepting GoodRx discounts, cutting off some or all of GoodRx's revenues for purchases at Kroger's pharmacies; and (iii) as a result, Defendants' representations about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

**THE TRUTH BEGINS TO EMERGE**

79.    On May 10, 2022, investors began to learn of the Company's over-reliance on Kroger and the risk that, notwithstanding GoodRx's contractual agreement with Kroger forming the Kroger Rx Savings Club, Kroger could unilaterally refuse to accept GoodRx's discounts.

80.    That day, the Company filed a quarterly report on Form 10-Q (the "1Q22 Form 10-Q"), which revealed that the Company "recognized that a grocery chain had taken actions late in the first quarter of 2022 that impacted acceptance of discounted pricing for a subset of drugs from PBMs" and that this "is expected to have an adverse impact on prescription transactions revenue in the future that may be material." Critically, the Company admitted that the disruption "could have an estimated revenue impact of roughly $30 million" in the second quarter of 2022, prompting GoodRx to issue disappointing second quarter 2022 revenue guidance of only about $190 million. GoodRx also acknowledged that "it is unlikely we will be

able to achieve the FY 2022 guidance we provided on our fourth quarter earnings call" and revealed that it "will not be providing full year expectations at this time as the full year impact of the grocer issue is difficult to estimate."

81.    During the 1Q22 Form 10-Q investor earnings call, Defendant Bezdek acknowledged:

> The [grocer issue] is [about] limiting acceptance of many [discount] programs at this grocer's pharmacy. This involves, to your point, essentially all PBMs. So this is across the bast majority of PBMs… In this case, this grocer is negotiating with almost all PBMs at the same time, and that effectively meant that discount pricing became unavailable to consumers at the same time.

82.    GoodRx admitted that this "grocer issue" accounted for "almost 1/4 of its prescription transaction revenue," yet comprised less than 5% of GoodRx's network of pharmacies.

83.    Despite GoodRx's refusal to identify Kroger as the grocer, various industry analysts including those from Barclays and Deutsche Bank determined that the "grocer issue" concerned the Kroger Rx Savings Club.

84.    On this news, GoodRx's stock price fell by approximately 25% per share, from the May 9, 2022 market close price of $10.75 per share to the May 10, 2022 market close price of $7.97 per share.

85.    Then, on August 09, 2022, GoodRx filed a quarterly report on Form 10-Q (the "2Q22 Form 10-Q"). The 2Q22 Form 10-Q continued to refer to Kroger's refusal as the "grocer issue," without revealing Kroger's identity.

86.     Under the heading "Use of Estimates", the 2Q22 Form 10-Q stated that "financial conditions continue to be difficult to estimate" considering the "impact of **a grocery chain** not accepting discounted pricing for a subset of drugs from our PBMs ("grocer issue")." The Company went on to reassure investors that "we expect our discounted pricing to be consistently welcomed at the point of sale by **the grocery chain**[.]" The Company made similar statements under the "Overview" section.

87.     During the investor earnings call held the same day, Defendant Bezdek revealed that, "[w]e exited the second quarter seeing approximately 20% of the weekly volume we processed through [Kroger] before the issue beginning of March." He concluded by announcing that "the grocer issue has been addressed."

88.     The truth fully emerged in the November 2022 Press Release, when GoodRx revealed that "[t]he estimated impact of the grocer issue on third quarter [prescription transactions revenue] was approximately $40 million" and that GoodRx expected a $45 to $50 million "estimated impact to prescription transactions revenue related to the previously disclosed grocer issue," despite the prior assertion that "the grocer issue ha[d] been addressed."

89.     During the investor earnings call held the same day, Defendant Bezdek revealed that, the "amount of prescription transactions revenue associated with the grocer decreased from $12.4 million to $4.3 million during th[e] period and [wa]s still well under the $33.7 million from third quarter 2021."

90.     Defendant Hirsch admitted that pharmacies retained the ability to unilaterally cease to accept GoodRx coupons and discount codes, as Kroger had done:

We have continued to maintain our really strong PBM marketplace. But in addition, we are selectively direct contracting with pharmacies and including many of the largest chains. That hybrid model really lets us ensure network stability. We want to make sure we don't have, and we don't anticipate having, any similar issue.

91.     On this news, GoodRx's stock price fell approximately 22% per share, from the November 8, 2022 market close price of $5.24 per share to the November 9, 2022 market close price of $4.06 per share.

### STOCK REPURCHASES

92.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent over $101.6 million to repurchase approximately 8,455,833 shares of its own common stock at artificially inflated prices between March 2022 and September 2022.

93.     According to the Q1 2022 10-Q, between March 1, 2022 and March 31, 2022, the Company purchased 5,637,005 shares of its common stock for approximately $83.76 million at an average price of $14.86 per share. As the Company's stock was actually worth only $4.06 per share, the price at closing on November 8, 2022, the Company overpaid by approximately $60,879,654 for repurchases of its own stock between March 1, 2022 and March 31, 2022.

94.     According to the Q3 2022 10-Q, between September 1, 2022 and September 30, 2022, the Company purchased 2,818,828 shares of its common stock for approximately $17.95 million at an average price of $6.37 per share. As the Company's stock was actually worth only $4.06 per share, the price at closing on

November 8, 2022, the Company overpaid by approximately $6,511,492 for repurchases of its own stock between September 1, 2022 and September 30, 2022.

95.     Accordingly, the Company overpaid for repurchases of its own stock by over $67.39 million.

## DAMAGES TO THE COMPANY

96.   As a direct and proximate result of the Individual Defendants' misconduct, GoodRx has expended and will continue to expend significant sums of money.

97.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

98.     Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

99.     As a direct and proximate result of the Individual Defendants' conduct, GoodRx has suffered and will continue to suffer a loss of reputation and goodwill which will plague the Company's share price going forward.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

100.   Plaintiff brings this action derivatively in the right of and for the benefit of GoodRx to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws.

101.    GoodRx is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

102.    Plaintiff is an owner of GoodRx stock and has been a continuous shareholder of Company stock at all relevant times.

103.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

104.    A pre-suit demand on the Board is futile and, therefore, excused. At the time this action was filed, GoodRx's Board consisted of the following ten individuals: Defendants Hirsch, Bezdek, Adams, Bradley, Deb, Mondre, Rey-Giraud, (the "Director-Defendants") and non-parties Kelly Kennedy, Simon Patterson, and Ian T. Clark. Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was filed.

105.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

106.    As Board members of GoodRx, charged with overseeing the Company's affairs, the Director-Defendants all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of GoodRx, the

1   Director-Defendants must have been aware of the material facts regarding the

2   issues plaguing GoodRx's business operations and accounting procedures.

3       107.   In complete abdication of their fiduciary duties, the Director-

4   Defendants either knowingly or recklessly caused or permitted GoodRx to issue

5   materially false and misleading statements. Specifically, the Director-Defendants

6   caused GoodRx to issue false and misleading statements which were intended to

7   make GoodRx appear more profitable and attractive to investors. Moreover, the

8   Director-Defendants caused the Company to fail to maintain internal controls. As

9   a result of the foregoing, the Director-Defendants breached their fiduciary

10  duties, face a substantial likelihood of liability, are not disinterested, and

11  demand upon them is futile, and thus excused.

12      108.   Additional reasons that demand on Defendant Hirsch is futile

13  follow. Defendant Hirsch co-founded GoodRx in 2011, served as the Company's co-

14  CEO from its inception until April 2023 and continues to serve as a Company

15  director. Since April 2023, Defendant Hirsch has served as the Company's Chief

16  Mission Officer. As the Company's co-founder, former highest officer, current

17  officer, and influential member of the Board, Defendant Hirsch was ultimately

18  responsible for the issuance of all of the false and misleading statements during

19  the Relevant Period, including the false and misleading statements in the

20  Prospectus, the 2020 10-K, 2021 10-K, the 1Q22 Form 10-Q, and the 2Q22 Form

21  10-Q, all of which he signed. In addition, Defendant Hirsch issued false and

22  misleading statements during the relevant earnings call pursuant to each relevant

23  quarter above, and personally made false and misleading statements during

24  various industry conferences. The Company provides Defendant Hirsch with

25  his principal occupation, for which he receives handsome compensation, as

26

27

28

34

detailed above. Additionally, he is not an independent director. As the Company's former highest officer and influential member of the Board, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Additionally, he engaged in lucrative insider trading, obtaining personal profits of approximately $20.4 million. For these reasons, Defendant Hirsch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

109. Additional reasons that demand on Defendant Bezdek is futile follow. Defendant Bezdek co-founded GoodRx in 2011 and served as the Company's co-CEO from its inception until April 2023. Since April 2023, Defendant Bezdek has served as the Company's Chairman of the Board. As the Company's former highest officer and current Chairman of the Board, Defendant Bezdek was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period, including the false and misleading statements in the Prospectus, the 2020 10-K, the 2021 10-K, the 1Q22 Form 10-Q, and the 2Q2022 Form 10-Q, all of which he signed. In addition, Defendant Bezdek issued false and misleading statements during the relevant earnings calls pursuant to each relevant quarter above. The Company provides Defendant Bezdek with handsome compensation, as detailed above . As the Company admits, Defendant Bezdek does not qualify as an independent director. As the Company's co-founder and current Chairman of the Board, he conducted

little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. Additionally, he engaged in lucrative insider trading, obtaining personal profits of approximately $20 million. For these reasons, Defendant Bezdek breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

110.  Additional reasons that demand on Defendant Adams is futile follow. Defendant Adams has served as a Company director since October 2015. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Adams personally signed the false and misleading Prospectus, 2020 10-K, and 2021 10-K. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Adams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

111.  Additional reasons that demand on Defendant Bradley is futile follow. Defendant Bradley has served as a Company director since August 2020. She also serves as the Chair of the Audit Committee. Defendant Bradley has

received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Bradley personally signed the false and misleading Prospectus, 2020 10-K, and 2021 10-K. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Bradley breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

112.    Additional reasons that demand on Defendant Deb is futile follow. Defendant Deb has served as a Company director since August 2015. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Deb personally signed the false and misleading Prospectus, 2020 10-K, and 2021 10-K. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Deb breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113.    Additional reasons that demand on Defendant Rey-Giraud is futile follow. Defendant Rey-Giraud has served as a Company director since June 2016.

She also serves as the Chair of the Compliance Committee and serves on the Audit Committee. Defendant Rey-Giraud has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Rey-Giraud personally signed the false and misleading Prospectus, 2020 10-K, and 2021 10-K. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. Additionally, she engaged in lucrative insider trading, obtaining personal profits of approximately $5.3 million. For these reasons, Defendant Rey-Giraud breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

114.    Additional reasons that demand on Defendant Mondre is futile follow. Defendant Mondre has served as a Company director since October 2018. He is currently the Chair of the Compensation Committee. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Mondre personally signed the false and misleading Prospectus, 2020 10-K, and 2021 10-K. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Mondre breached his fiduciary duties, faces a substantial likelihood of liability, is not

independent  or disinterested, and thus demand upon him is futile and, therefore, excused.

115.    Additional reasons that demand on Non-Party Kennedy is futile follow. Kennedy has served as a Company director since December 2023. The Company provides Kennedy with significant compensation as detailed above. As such, Kennedy cannot independently or disinterestedly consider any demand adverse to the Director-Defendants serving on the Compensation Committee who determine Kennedy's compensation. Kennedy therefore could not objectively consider a demand to sue the Individual Defendants and any demand upon her is futile.

116.    Additional reasons that demand on Non-Party Clark is futile follow. Clark has served as a Company director since July 2024. The Company provides Clark with significant compensation as detailed above. As such, Clark cannot independently or disinterestedly consider any demand adverse to the Director-Defendants serving on the Compensation Committee who determine Clark's compensation. Clark therefore could not objectively consider a demand to sue the Individual Defendants and any demand upon him is futile.

117.    Additional reasons that demand on the Board is futile follow.

118.    Each of the Director-Defendants, individually and collectively, faces  a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by approximately $67.39 million for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants    breached    their

fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

119.   The Director-Defendants have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. For instance, Director-Defendants Hirsch and Bezdek co-founded the Company, previously served as the co-CEOs of the Company together during the Relevant Period and have served on its Board since 2011. Similarly, Director-Defendants Adams and Deb have served on the Board since 2015, and Director-Defendant Rey-Giraud has served on the Board since 2016. These conflicts of interest preclude Director-Defendants Hirsch, Bezdek, Adams, Deb, and Rey-Giraud from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon Director-Defendants Hirsch, Bezdek, Adams, Deb, and Rey-Giraud is futile.

120.   Defendants Rey-Giraud and Bradley served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in  the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting,

disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

121.   In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

122.   GoodRx has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for GoodRx any part of the damages GoodRx suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

123.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of

duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

124. The acts complained of herein constitute violations of fiduciary duties owed by GoodRx's officers and directors, and these acts are incapable of ratification.

125. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of GoodRx. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of GoodRx, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

126. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause GoodRx to sue the Individual Defendants

named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

127. Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIM I

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

128. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

129. The Individual Defendants, by virtue of their positions with GoodRx and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of GoodRx and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause GoodRx to engage in the illegal conduct and practices complained of herein.

130. Plaintiff on behalf of GoodRx has no adequate remedy at law.

## CLAIM II

### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

131. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding GoodRx. Not only is GoodRx now

defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon GoodRx by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase more than seven million of its own shares at artificially inflated prices, damaging GoodRx.

133. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about GoodRx not misleading.

134. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and directors of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by GoodRx.

135. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings

from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

136.   By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

137.   Plaintiff on behalf of GoodRx has no adequate remedy at law.

## CLAIM III

**Against the Individual Defendants for Breach of Fiduciary Duties**

138.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

139.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of GoodRx's business and affairs.

140.   Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

141.   The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of GoodRx. In breach of their fiduciary duties owed to GoodRx, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that:  (i) while Kroger accounted for less than 5% of the pharmacies accepting GoodRx discounts, Kroger was responsible for nearly 25% of GoodRx's total

45

prescription transactions revenue (the Company's primary revenue stream); and (ii) Kroger could unilaterally cease accepting GoodRx discounts, cutting off some or all of GoodRx's revenues for purchases at Kroger's pharmacies; and (iii) as a result, Defendants' representations about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

142.   As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

143.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

144.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

145.   In yet further breach of their fiduciary duties, during the Relevant Period, four of the Individual Defendants engaged in lucrative insider sales while the stock prices were artificially inflated before the fraud was exposed, netting proceeds in the millions individually.

146.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed

46

knowingly or recklessly and for the purpose and effect of artificially inflating the price of GoodRx's securities.

147.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct  was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of GoodRx's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

148.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

149.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, GoodRx has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

150.   Plaintiff, on behalf of GoodRx, has no adequate remedy at law.

## CLAIM IV

### Against the Individual Defendants for Unjust Enrichment

151.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

47

152.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, GoodRx.

153.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from GoodRx that was tied to the performance or artificially inflated valuation of GoodRx, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

154.   Plaintiff, as a shareholder and a representative of GoodRx, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

155.   Plaintiff on behalf of GoodRx has no adequate remedy at law.

## CLAIM V

### Against the Individual Defendants for Abuse of Control

156.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence GoodRx, for which they are legally responsible.

158.   As a direct and proximate result of the Individual Defendants' abuse of control, GoodRx has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

159.   Plaintiff on behalf of GoodRx has no adequate remedy at law.

## CLAIM VI

### Against the Individual Defendants for Gross Mismanagement

160.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

161.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of GoodRx in a manner consistent with the operations of a publicly held corporation.

162.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, GoodRx has sustained and will continue to sustain significant damages.

163.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

164.   Plaintiff, on behalf of GoodRx, has no adequate remedy at law.

## CLAIM VII

### Against the Individual Defendants for Waste of Corporate Assets

165.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the

shareholders and the Company.

167.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused GoodRx to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

168.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

169.    Plaintiff, on behalf of GoodRx, has no adequate remedy at law.

## CLAIM VIII

### Against Defendants Hirsch, Bezdek, and Voermann for Contribution Under Sections 10(b) and 21D of the Exchange Act

170.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

171.    GoodRx and Defendants Hirsch, Bezdek, and Voermann are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Hirsch's, Defendant Bezdek's, and Defendant Voermann's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

172.    Defendants Hirsch, Bezdek, and Voermann, because of their positions of control and authority as officers and/or directors of the Company,

were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

173.    Accordingly, Defendants Hirsch, Bezdek, and Voermann are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

174.    As such, GoodRx is entitled to receive all appropriate contribution  or indemnification from Defendants Hirsch, Bezdek, and Voermann.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties and other unlawful conduct;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and

1   expenses; and

2   E.    Granting such other and further relief as the Court deems just and

3   proper.

4                              **JURY DEMAND**

5       Plaintiff hereby demands a trial by jury.

6

7       Dated: August 27, 2024          Respectfully submitted,

8

9                                       **THE ROSEN LAW FIRM, P.A.**

10                                      /s/Laurence M. Rosen
                                        Laurence M. Rosen, Esq. (SBN 219683)
11                                      355 South Grand Avenue, Suite 2450
                                        Los Angeles, CA 90071
12                                      Telephone: (213) 785-2610
                                        Facsimile: (213) 226-4684
13                                      Email: lrosen@rosenlegal.com

14
                                        *Counsel for Plaintiff Sharon Burgs*
15

16

17

18

19

20

21

22

23

24

25

26

27
                                        52
28

## <u>**VERIFICATION**</u>

I, Sharon Burgs, am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

Dated: 8/26/2024

Signed by:

Sharon Burgs